**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

*Attorneys for Plaintiff Martis Childs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIS CHILDS,<br><br>    Plaintiff,<br><br>    v.<br><br>COUNTY OF LOS ANGELES, RICHARD BIDDLE, KENT WEGENER, BARRY HALL, and DOES 1–10,<br><br>    Defendants. | Case No.: 2:25-cv-415<br><br>**COMPLAINT FOR DAMAGES**<br><br><u>Federal Claims</u><br>1.  42 U.S.C. § 1983, *Brady* Violations;<br>2.  42 U.S.C. § 1983, *Manson/Biggers* Violations;<br>3.  42 U.S.C. § 1983, *Malicious Prosecution;*<br>4.  42 U.S.C. § 1983, *Monell* Liability;<br><br><u>State Claims</u><br>5.  Malicious Prosecution;<br>6.  False Imprisonment;<br>7.  False Arrest;<br>8.  Negligence;<br>9.  Violation of the Bane Act (Civil Code § 52.1)<br><br>**DEMAND FOR JURY TRIAL** |

## **COMPLAINT FOR DAMAGES**

COME NOW, Plaintiff MARTIS CHILDS for his Complaint against COUNTY OF LOS ANGELES, RICHARD BIDDLE, KENT WEGENER, BARRY HALL, and DOES 1–10 and hereby alleges as follows:

## **INTRODUCTION**

1.     This civil rights action arises from the Los Angeles Sheriff's Department's deliberate suppression of crucial exculpatory evidence that resulted in Plaintiff MARTIS CHILDS spending fourteen years in prison for a murder he did not commit. In 2009, detectives secretly recorded a conversation between CHILDS and two co-defendants that powerfully demonstrated his innocence. The recording captured the co-defendants privately discussing how the actual killer, Gregory "G-Red" Moody, was attempting to frame CHILDS. Rather than disclosing this evidence, as constitutionally required, detectives buried it while building a case against CHILDS based on coerced testimony from witnesses who had initially denied his involvement. Only after this recording was finally revealed in 2023 was CHILDS able to prove his innocence and secure his acquittal at retrial.

## **THE PARTIES**

2.     Plaintiff MARTIS CHILDS is, and at all relevant times was, a resident of Los Angeles County, California.

3.     Defendant RICHARD BIDDLE was, at all relevant times, a detective with the Los Angeles County Sheriff's Department. He was one of the lead investigators in the murder case against CHILDS and participated in suppressing exculpatory evidence, including the March 11, 2009 recording. He is sued in his individual capacity.

4.     Defendant BARRY HALL was, at all relevant times, a detective with the Los Angeles County Sheriff's Department who participated in the

investigation of the Pace Avenue shooting and the suppression of exculpatory evidence. He is sued in his individual capacity.

5.      Defendant KENT WEGENER was, at all relevant times, a detective with the Los Angeles County Sheriff's Department who participated in conducting an improperly suggestive photo lineup with witness Nathan Wheaton. He is sued in his individual capacity.

6.      DOES 1–10 were, at all relevant times, law enforcement officers, detectives, supervisors, or other employees of the Los Angeles County Sheriff's Department who participated in the investigation of the Pace Avenue shooting and the suppression of exculpatory evidence. Their true names and capacities are currently unknown to CHILDS. They are sued in their individual capacities.

7.      On April 15, 2024, CHILDS timely filed a California Government Code claim with Los Angeles County, which was rejected on July 17, 2024.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution. This Court has supplemental jurisdiction over CHILDS' state law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred within this district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

10.    On February 6, 2006, at approximately 8:54 PM, a group of three to four males approached several individuals who were gathered outside 9418 Pace Avenue in Los Angeles, California. The assailants questioned the group about their gang affiliation and began "pocket-checking"[1] the males present at the location.

11.    When Joseph Bryant resisted the assailants, a physical altercation ensued, during which one of the assailants produced a handgun and shot Bryant multiple times. Bryant was later found deceased, face-down in the street.

12.    Another victim, Trarell Mathis, was shot in the upper back by one of the assailants. Mathis survived his injuries.

13.    Less than 4 minutes after the shooting, CHILDS was stopped for a traffic violation while driving his car several blocks from the scene of the murder. He was not considered a suspect in the shooting; he was, however, upon the subsequent search of his vehicle by the officers effecting the traffic stop, arrested for possession of rock cocaine.

14.    When deputies detained CHILDS, one of them stated there was "nothing unusual about him." He was neither nervous, sweating, nor fidgeting. In May 2006, CHILDS pled guilty to drug charges and was sentenced to four years in prison.

15.    There were more than five eye-witnesses to the shooting. Investigators showed them photo line-ups shortly after the incident, which included photos of CHILDS as filler.[2] The witnesses identified Markease

---

[1] "Pocket-checking" is a term used to describe when gang members forcibly search victims' pockets, typically as part of a robbery or show of dominance over claimed territory.

[2] In police photo lineup procedures, a "filler" refers to a photo of someone who is not a suspect but is included in the lineup to make it fair and prevent bias. Fillers

Williams, Carl Arline, and Levitius Wright as involved in the shooting. They did not identify CHILDS.

16.    Eight hours after the shooting, scent canines from the Los Angeles Sheriff's Department were used to track the shooter using scent pads from the spent bullet casings at the scene. The canines alerted at two residences associated with Gregory Moody: his mother's house and his current home. Moody was a known gang member and associate of Wright, Arline, and Williams. He was known by his gang moniker, "G-Red."

17.    On May 16, 2006, Moody was detained on a probation violation.  Detectives investigating the shooting interviewed him while he was in custody.

18.    Moody asked the detectives if they could get the drug charges against him dropped if he told them who shot Bryant on Pace Street. The detectives said they would "pull some strings," and turned the recorder off. When it was turned back on, Moody alleged that CHILDS was the shooter.

19.    Moody told detectives that, on the night of the shooting, he was watching television with his girlfriend at their apartment at 9215 Hooper Street when they heard gunshots. He went outside, where CHILDS approached him and said he "didn't mean to shoot the boy on Pace." Then he saw CHILDS buy drugs from someone and leave the area.

20.    No one confirmed Moody's story, despite his claim that many witnesses were present. Based on what investigators knew at the time, Moody's story was implausible: CHILDS' arrest occurred just four minutes after the shooting, leaving no time for him to walk to Moody's house, discuss the murder, buy drugs, walk to his car, drive several blocks, and get pulled over by police. Moreover, it was later confirmed that the specific

---

are typically people who match the general physical description of the suspect but are known to be uninvolved in the crime.

people Moody placed outside his apartment could not have been there.

21.    Moody was the first to implicate CHILDS. His statement, though filled with lies and omissions about both CHILDS and his own alibi, effectively shifted the investigation away from himself through fabricated allegations against CHILDS. Detective BIDDLE testified that before the May 16 interview with Moody, he had not identified anyone as the suspected shooter.

### Investigators Target Childs

22.    After interviewing Moody, investigators abandoned any good-faith search for the shooter and focused solely on building a case against CHILDS.

23.    Investigators approached Williams, Wright, and Arline, and began pressuring them to testify that CHILDS was the shooter.

24.     On October 17, 2008, Williams was told by investigators that they knew CHILDS was the shooter and asked to confirm that he saw him at the scene, but he refused to provide any information. On November 3, 2008, Williams explicitly told detectives that CHILDS was not present on Pace at the time of the shooting, and accused the detectives of trying to plant the idea of CHILDS' involvement in people's minds. **The report describing this interview was not turned over to CHILDS' attorneys until 2023.** Williams was arrested on February 27, 2009, for his role in the murder. Under questioning that day he repeatedly denied that CHILDS was the shooter.

25.    Wright made multiple inconsistent statements regarding the shooting. In his initial May 31, 2006 interview while in custody for a parole violation, Wright claimed CHILDS was present with a silver gun but stated

he did not see CHILDS use the gun.[3] But in a **November 2008 interview that was not disclosed to the defense until 2023**, Wright declined to confirm his earlier statements about CHILDS being at the scene.

26.    On March 11, 2009, law enforcement placed Williams, Wright, and CHILDS together in a holding cell while recording their conversation. The interaction lasted approximately four hours and was notably absent of any typical gang-related greetings, threats, or violence. When first brought into the cell, CHILDS attempted to understand the situation by sharing what he had learned about the case and expressing his confusion. Neither Wright nor Williams challenged CHILDS' expressions of confusion or his claims of innocence.

27.    CHILDS was removed from the cell to attend his arraignment and speak with his attorney. While he was absent, Wright and Williams did not express any dismay about CHILDS' denials; instead, they discussed how someone named "G-Red" (Moody) was pinning the murder on a "dirty n*****," i.e., someone who had already been arrested on another charge.

28.    Upon returning to the cell, despite having just learned that Wright and Williams may have implicated him in a murder case, CHILDS remained calm and asked them about their statements, expressing disbelief and confusion. At no point did Wright or Williams confront CHILDS or claim he was present at the scene. The recording captured discussions about "G-Red going home" and a discussion that they should tell detectives that "G-Red" was the shooter.

29.    Throughout the entire four-hour recorded interaction, CHILDS consistently maintained his innocence and his ignorance of the facts of the

---

[3] During CHILDS' habeas proceedings in 2019, Wright explained he had initially implicated CHILDS because he was young, scared, and telling detectives what they wanted to hear.

murder. Wright and Williams demonstrated complete acceptance of these denials, never challenging CHILDS' account, never expressing impatience with his claims of ignorance, and never indicating that they believed him to be the actual shooter.

30.    **This March 11, 2009 recording was not disclosed to CHILDS' attorneys until 2023.**

### Arline and Williams Testify Against
### Childs for Favorable Plea Deals

31.    Arline was arrested in July of 2009. Initially, Arline stated CHILDS was not in a gang and was not involved in the shooting. However, after an alleged recorder malfunction during the same interview, Arline changed his account to implicate CHILDS as the shooter. During his January 2011 plea deal proffer, Arline claimed he witnessed CHILDS shoot the victim with a chrome gun. While negotiating his plea deal, Arline explicitly told detectives "I will say anything you want me to say."

32.    Williams also agreed to falsely testify against CHILDS in exchange for a favorable plea deal. On January 7, 2011, during a proffer with the District Attorney, Williams agreed to testify that CHILDS was the shooter.

33.    Wright was pressured to testify against CHILDS on multiple occasions. Despite detectives repeatedly encouraging him to give "mitigating circumstances" that they could communicate to the prosecutor, Wright refused to testify against an innocent man.

34.    CHILDS and Wright were tried and convicted in May 2011. Williams and Arline were the prosecution's key witnesses and they testified consistent with their proffers.

### Post-Trial Developments and Habeas Proceeding

35.    After the trial, Williams and Wright submitted signed

declarations stating that Moody was the shooter, not CHILDS. They further stated under oath that after the murder, there was an agreement between Moody, Wright, Williams, and Arline to identify CHILDS as the shooter since he had already been arrested that evening.

36.    CHILDS filed a Petition for Writ of Habeas Corpus on December 30, 2014, claiming that Williams' and Arline's trial testimony implicating him was false and that new evidence existed proving both its falsity and his innocence. To resolve disputed facts, the court held an evidentiary hearing, which was conducted over ten days in 2019.

37.    At the evidentiary hearing, Wright testified under oath that Moody was the actual shooter and that CHILDS was not present at the scene. Wright explained he had initially implicated CHILDS because he was young, scared, and telling detectives what they wanted to hear.

38.    Williams backed away from some portions of his declaration, fearing that his plea deal could be revoked. However, he testified that the shooter was "light-skinned" while CHILDS is dark-skinned, and that Moody's complexion matched the shooter's. He concluded his testimony by stating that "in front of the eyes of God," he was certain CHILDS was not the shooter.

39.    The court granted CHILDS' habeas petition, finding the evidence surrounding Moody to be particularly compelling. Moody was the first person to implicate CHILDS as a suspect, and his own alibi contained multiple inconsistencies about who was present at his apartment after the murder. While two police dogs had tracked to Moody's apartment on the night of the murder, investigators appeared to lose interest in him as a suspect after he deflected their attention to CHILDS. The new evidence presented during the habeas hearing, combined with the fact that none of the victim witnesses had identified CHILDS at the time of the shooting (while

9

Wright, Williams, and Arline were quickly identified as being involved), strongly suggested that CHILDS was not the shooter and that Moody may have orchestrated a false accusation against CHILDS to cover up his own role as the shooter. The court ordered CHILDS to be retried or released.

## Childs Retried and Acquitted

40.    The Los Angeles District Attorney's Office elected to retry CHILDS.

41.    CHILDS retained criminal defense attorney Gretchen Gaspari to represent him.

42.    In May 2023, while preparing for trial, Gaspari received previously undisclosed evidence, including the crucial March 11, 2009 recording of Williams, Wright, and CHILDS in the holding cell. This recording had been withheld from the defense for 14 years.

43.    The March 11, 2009 recording became a centerpiece of the defense's case at CHILDS' retrial. Over several hours, the jury heard the unguarded conversations between the three men, which powerfully supported the defense theory that CHILDS had nothing to do with the murder and Moody had orchestrated a false accusation against CHILDS. Particularly compelling was the recorded discussion between Wright and Williams while CHILDS was absent from the cell, during which they openly discussed how "G-Red" was pinning the murder on a "dirty n*****," i.e., someone who had already been arrested on another charge.

44.    Gaspari devoted a substantial portion of her closing argument to analyzing the March 2009 recording, and she believes it was a critical part of what enabled CHILDS to prevail at trial.

45.    On October 31, 2023, after hearing all the evidence, the jury found CHILDS not guilty. He was finally released after serving nearly 14 years in prison, having been incarcerated since 2009.

46.    The March 11, 2009 recording proved to be decisive exculpatory evidence that, had it been properly disclosed before CHILDS' first trial, could have prevented his wrongful conviction and averted the fourteen years stolen from his life.

## FIRST CLAIM FOR RELIEF

### Fourteenth Amendment—*Brady* Violations (42 U.S.C. § 1983)
(Plaintiff against BIDDLE, HALL, and DOES 1–10)

47.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

48.    Defendants BIDDLE, HALL, and DOES 1–10 violated CHILDS' constitutional rights under the Due Process Clause of the Fourteenth Amendment by deliberately withholding material exculpatory evidence that was favorable to his defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

49.    The withheld evidence was favorable to CHILDS both because it was exculpatory and because it could have been used to impeach prosecution witnesses.

50.    BIDDLE, HALL, and DOES 1–10 suppressed a March 11, 2009, recorded conversation between CHILDS and co-defendants Wright and Williams, which captured Wright and Williams discussing how "G-Red" (Moody) was pinning the murder on someone else, with neither co-defendant challenging CHILDS' repeated claims of innocence during the four-hour interaction. The recording further contained a discussion about telling detectives that "G-Red" was the actual shooter.

51.    BIDDLE, HALL, and DOES 1–10 also suppressed Williams' October 17, 2008 and November 3, 2008 statements to investigators, in which he explicitly stated that CHILDS was not present at the scene of the shooting, accused detectives of trying to plant the idea of CHILDS'

involvement, and repeatedly denied that CHILDS was the shooter.

52.    The suppression of this evidence greatly prejudiced CHILDS. There is a reasonable probability that, had this evidence been disclosed prior to CHILDS' first trial, the result would have been different. The evidence puts the whole case in such a different light as to undermine confidence in the original verdict, as evidenced by the defense's successful use of the recording at retrial, the jury's not guilty verdict after hearing the previously suppressed evidence, and the recording's corroboration of the defense theory that Moody orchestrated false testimony against CHILDS.

53.    Defendants were each jointly and severally responsible to ensure that material exculpatory evidence was disclosed to the defense, and violated that responsibility. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein, and ratified, approved or acquiesced in it.

54.    As a direct and proximate result of Defendants' unconstitutional actions, CHILDS was wrongfully convicted and imprisoned for approximately fourteen years, suffering substantial damages including loss of liberty, emotional distress, and economic losses.

## SECOND CLAIM FOR RELIEF

**Fourteenth Amendment—*Manson/Biggers* Violations (42 U.S.C. § 1983)**
(Plaintiff against BIDDLE, WEGNER, and DOES 1–10)

55.    CHILDS realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

56.    On May 24, 2006, BIDDLE and WEGENER conducted a photographic lineup with witness Nathan Wheaton, presenting him with a six-photograph array that included CHILDS' photograph. Prior to showing the array, Defendants informed Wheaton that it contained "a picture of the shooter."

57.     Wheaton identified three different photographs as potentially matching his recollection of the shooter—the photographs in the lower left, top center, and bottom right positions. Despite this uncertainty and multiple identifications, Defendants directed Wheaton's attention exclusively to the lower left photograph depicting CHILDS, disregarding his other selections. Under this suggestive questioning, Wheaton ultimately circled CHILDS' photograph while expressing significant uncertainty, rating his confidence level as "six out of ten."

58.     Defendants' conduct was particularly egregious given their false statement to Wheaton that they had not shown him a picture of the shooter yet. In fact, they had shown Wheaton CHILDS' photograph three months earlier in photo arrays where he identified Wright, Arline, and Williams, but did not identify CHILDS. By falsely suggesting this was Wheaton's first opportunity to view CHILDS' photograph, Defendants created an expectation that the true perpetrator was being shown for the first time, priming Wheaton to make an identification he had not made when viewing the same photograph previously. This deceptive priming, combined with their suggestive focus on the lower left photograph, improperly influenced Wheaton's identification process.

59.     The unreliability of this identification procedure was demonstrated by Wheaton's subsequent testimony under oath at CHILDS' preliminary hearing, where Wheaton stated that the shooter was not present in the courtroom. Furthermore, Wheaton did not identify CHILDS as the shooter at trial.

60.     Defendants BIDDLE and WEGNER,  and DOES 1–10, while acting under color of law, deprived CHILDS of his civil rights by violating his right to have an eyewitness identification by Nathan Wheaton that was free from suggestion or influence by police, as set forth in *Manson v.*

*Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972). The actions of each defendant in violating CHILDS' right to have an eyewitness identification by Nathan Wheaton that was free from suggestion or influence by police were done with deliberate indifference to and/or reckless disregard for CHILDS' rights or for the truth.

61. The constitutional source of the obligation to conduct eyewitness identifications free from improper suggestion or influence is the Due Process Clause of the Fourteenth Amendment.

62. The acts of improper suggestion and influence include: telling Wheaton that the photo line-up included the shooter; directing his attention to one of three photos he identified initially; and telling him these were new individuals, but showing him a picture they had already shown him previously.

63. Defendants were each jointly and severally responsible to ensure that any identification procedure was free from suggestion or influence by police, and violated that responsibility. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein, and ratified, approved or acquiesced in it.

64. As a direct and proximate result of Defendants' unconstitutional actions, CHILDS was wrongfully convicted and imprisoned for approximately fourteen years, suffering substantial damages including loss of liberty, emotional distress, and economic losses.

### THIRD CLAIM FOR RELIEF

**Fourth Amendment—*Malicious Prosecution* (42 U.S.C. § 1983)**
(Plaintiff against BIDDLE, HALL, WEGNER, and DOES 1–10)

65. CHILDS realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

66. Defendants maliciously initiated and continued a criminal

investigation and prosecution against CHILDS without probable cause and with malice, resulting in CHILDS' wrongful conviction and imprisonment.

67.    The prosecution was terminated in CHILDS' favor when he was acquitted at retrial on October 31, 2023.

68.    Defendants withheld exculpatory evidence, including the March 11, 2009 recording and Williams' statements denying CHILDS' involvement; used improper identification procedures to influence witness testimony; and pressuring witnesses to provide false testimony against CHILDS. They did all this while protecting Moody from further investigation, though he was the most likely suspect.

69.    As a direct and proximate result of Defendants' conduct, CHILDS suffered damages including the deprivation of his liberty through seizure, emotional distress, and economic losses during his fourteen-year imprisonment.

70.    The acts of Defendants were willful, wanton, malicious, and oppressive, and done with reckless disregard for CHILDS' constitutional rights, justifying an award of punitive damages.

### FOURTH CLAIM FOR RELIEF

### Fourteenth Amendment—*Monell* Violations (42 U.S.C. § 1983)
(Plaintiff against LOS ANGELES COUNTY)

71.    CHILDS realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

72.    CHILDS is informed and believes and thereon alleges that, at all times herein mentioned, Defendant Los Angeles County engaged in the unconstitutional conduct and omissions with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of CHILDS. Los Angeles County's unconstitutional customs and/or policies include:

(a) Failing to adequately train, supervise and control its employees in the investigation and questioning of witnesses, including the prevention of unconstitutional influence of witnesses through improper interviewing techniques and suggestive identification procedures;

(b) Failing to adequately train, supervise and control its employees to disclose to the District Attorney's Office exculpatory and impeachment evidence, including recorded conversations and witness statements that contradict the prosecution's theory;

(c) Failing to adequately discipline deputies who engage in improper identification procedures, such as telling witnesses that a photo lineup contains a murderer;

(d) Condoning and encouraging deputies in the belief that they can violate the rights of persons such as CHILDS with impunity by withholding exculpatory evidence for over a decade;

(e) Failing to adequately investigate incidents involving the fabrication of evidence, wrongful influence of identifications, or other misconduct by its deputies;

(f) Conducting investigations in such a manner as to conceal misconduct by employees, including the suppression of the March 11, 2009 recording and Williams' exculpatory statements for 14 years;

(g) Condoning and encouraging the fabrication of evidence including but not limited to using improper techniques to influence eyewitness identifications, pressuring witnesses to change their statements through promises of leniency, and

16

withholding evidence that contradicts the prosecution's theory.

73.     The actions and inactions of the Los Angeles County Sheriff's Department set forth above were known or should have been known to the policy makers responsible for the Los Angeles County Sheriff's Department and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training and supervision was obvious.

74.     The actions of the Los Angeles County Sheriff's Department set forth herein were a moving force behind the violations of CHILDS' constitutional rights as set forth in this complaint.

75.     As a direct and proximate result of Defendant Los Angeles County Sheriff's Department's acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of its deputies' acts and omissions, CHILDS was wrongfully convicted and imprisoned for approximately fourteen years, suffering substantial damages including loss of liberty, emotional distress, and economic losses.

## FIFTH CLAIM FOR RELIEF

### Malicious Prosecution
(Plaintiff against BIDDLE and LOS ANGELES COUNTY)

76.     CHILDS realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

77.     Defendants maliciously initiated and continued a criminal prosecution against CHILDS without probable cause and with malice, resulting in CHILDS' wrongful conviction and imprisonment.

78.     The prosecution was terminated in CHILDS' favor when he was acquitted at retrial on October 31, 2023.

79.    Defendants acted with malice and without probable cause by: withholding exculpatory evidence, including the March 11, 2009 recording and Williams' statements denying CHILDS' involvement; using improper identification procedures to influence witness testimony; and pressuring witnesses to provide false testimony against CHILDS.

80.    As a direct and proximate result of Defendants' conduct, CHILDS suffered damages including loss of liberty, emotional distress, and economic losses during his fourteen-year imprisonment.

## SIXTH CLAIM FOR RELIEF

### False Imprisonment
(Plaintiff against BIDDLE and LOS ANGELES COUNTY)

81.    CHILDS realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

82.    Defendants intentionally deprived CHILDS of his freedom of movement by causing his wrongful arrest, prosecution, conviction, and imprisonment through the fabrication of evidence, suppression of exculpatory evidence, and use of improper identification procedures.

83.    CHILDS' confinement was accomplished without his consent and without lawful privilege.

84.    As a direct and proximate result of Defendants' conduct, CHILDS was wrongfully imprisoned for approximately fourteen years, suffering substantial damages including loss of liberty, emotional distress, and economic losses.

## SEVENTH CLAIM FOR RELIEF

### False Arrest
(Plaintiff against BIDDLE and LOS ANGELES COUNTY)

85.    CHILDS realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

COMPLAINT FOR DAMAGES

86.    Defendants caused CHILDS to be arrested and detained without probable cause by fabricating evidence, suppressing exculpatory evidence, and using improper identification procedures to create the false appearance of probable cause.

87.    Defendants' conduct in causing CHILDS' arrest was a substantial factor in causing him harm.

88.    As a direct and proximate result of Defendants' conduct, CHILDS suffered damages including loss of liberty, emotional distress, and economic losses.

## EIGHTH CLAIM FOR RELIEF

### Negligence
(Plaintiff against BIDDLE and LOS ANGELES COUNTY)

89.    CHILDS realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

90.    Defendants owed CHILDS a duty of care to conduct criminal investigations and prosecutions in accordance with constitutional requirements and accepted professional standards.

91.    Defendants breached their duty of care by failing to properly investigate Gregory Moody as a suspect despite compelling evidence. Two police dogs tracked to Moody's current and former residences on the night of the murder, Moody was a known gang member and associate of the other suspects, his alibi statement contained multiple inconsistencies, and he only implicated CHILDS after seeking leniency on his own charges. Despite these red flags, Defendants negligently abandoned their investigation of Moody after he deflected attention to CHILDS.

92.    Defendants further breached their duty through negligent identification procedures. Detective BIDDLE improperly told Nathan Wheaton that the photo lineup included the shooter before showing him the

lineup, failed to document or investigate Wheaton's previous non-identification of CHILDS in earlier photo lineups, and proceeded with the identification despite Wheaton's expressed uncertainty and low confidence rating of 6 out of 10.

93.   Defendants also breached their duty to turn over exculpatory evidence to CHILDS before his first trial, as described in Claim One, above.

94.   Additionally, Defendants breached their duty by failing to properly supervise and train personnel regarding proper identification procedures, the obligation to investigate alternative suspects, and the requirements for disclosure of exculpatory evidence. This systemic negligence directly contributed to the investigation's failures and the resulting miscarriage of justice.

95.   Defendants' negligent conduct fell well below the standard of care expected of reasonable law enforcement officers and investigators in the community.

96.   As a direct and proximate result of Defendants' negligence, CHILDS suffered substantial damages. These damages include the loss of liberty through fourteen years of wrongful imprisonment, severe emotional distress and mental anguish, loss of income and earning capacity, loss of educational and professional opportunities, loss of family relationships and social connections, and physical hardships and deterioration from prolonged incarceration.

## NINTH CLAIM FOR RELIEF

### Violation of the Bane Act (Cal. Civil Code § 52.1)
(Plaintiff against BIDDLE and LOS ANGELES COUNTY)

97.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

98.   California Civil Code § 52.1 prohibits any person from

interfering, or attempting to interfere, by threats, intimidation, or coercion, with the exercise or enjoyment of any constitutional or statutory rights.

99.    Defendants interfered with CHILDS' constitutional rights through threats, intimidation, and coercion by using coercive tactics to pressure witnesses to provide false testimony, using intimidation during witness interviews, employing deceptive tactics during identification procedures, deliberately suppressing exculpatory evidence, and using threats of harsher prosecution to coerce witnesses into providing false testimony against CHILDS.

100.    Through these acts of threats, intimidation, and coercion, Defendants interfered with CHILDS' constitutional rights to due process, a fair trial, freedom from false arrest and imprisonment, the right to present a complete defense, and the right to be free from fabricated evidence.

101.    Defendants' conduct was a substantial factor in causing CHILDS harm, including his wrongful conviction and fourteen-year imprisonment.

102.    As a direct and proximate result of Defendants' violations of the Bane Act, CHILDS suffered severe harm, including loss of liberty, physical confinement, emotional distress, and economic losses.

103.    Defendants' conduct was willful, wanton, malicious, and oppressive, justifying an award of statutory and exemplary damages under Civil Code § 52.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MARTIS CHILDS requests entry of judgment in his favor against COUNTY OF LOS ANGELES, RICHARD BIDDLE, KENT WEGENER, BARRY HALL, and DOES 1–10, as follows:

1.    For compensatory damages in an amount to be determined at trial;

2.    For punitive damages against the individual defendants;

3.  For reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988;

4.  For pre-judgment and post-judgment interest as permitted by law; and

5.  For such other and further relief as the Court may deem just, proper, and appropriate.

DATED: January 16, 2025                **LAW OFFICES OF DALE K. GALIPO**


                                       By:   _/s/_    _Dale K. Galipo_
                                             Dale K. Galipo
                                             Cooper Alison-Mayne
                                             *Attorneys for Plaintiff Martis Childs*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby submits this demand that this action be tried in front of a jury.

DATED: January 16, 2025          **LAW OFFICES OF DALE K. GALIPO**


By:   */s/     Dale K. Galipo*
    Dale K. Galipo
    *Attorney for Plaintiff*